IN THE

TENTH COURT OF APPEALS




 
 
 
 
 
 
 


 



No. 10-04-00248-CR

 

Jonathan P. Durham,

                                                                      Appellant

 v.

 

The State of Texas,

                                                                      Appellee

 

 

 



From the 258th District Court

Polk County, Texas

Trial Court No. 17398

 



MEMORANDUM  Opinion



 

          Appellant Jonathon P. Durham (Durham) appeals his conviction of
injury to a child and sixty-year sentence, asserting twenty-two issues.  Durham’s issues complain of the sufficiency of the evidence, the admission of autopsy
photographs and extraneous-offense evidence, alleged prosecutorial misconduct,
and an error by the trial court in jury instructions.  He also asserts that the
trial judge improperly entered the jury room during deliberations.  We will overrule
each issue and affirm the judgment.

I.                  
Background

          On the morning of July 12, Durham and Angela Miller, the parents of 29-day-old Chelsea Durham, took her to a Livingston hospital emergency room, reporting that she had choked on formula.  Chelsea was lifeless, but medical personnel were able to revive her and have her
transferred to Hermann Hospital in Houston, where she was found to be brain
dead.  She died on July 13 after being removed from life support.

Because her brain injuries and the scratches and
bruises on her head and face were suspicious and did not fit with the history
of choking, hospital personnel notified police.  Livingston police detective
Ken Bohnert began an investigation.  Bohnert learned from the Harris County
Medical Examiner that Chelsea had previously suffered broken ribs.  Durham was
arrested about six weeks later and charged with injury to a child:  intentionally
or knowingly causing serious bodily injury “by causing trauma to the head of
said Chelsea Durham and said trauma was inflicted by the hand of the Defendant
[Durham] or other object unknown to the Grand Jury, or by manner and means
unknown to the Grand Jury” on July 12, 2003.  See Tex. Pen. Code Ann. § 22.04(a)(1), (e)
(Vernon 2003).  A jury found Durham guilty after a two-week trial and assessed
a prison sentence of sixty years.

II.  Injury to a Child

          A person commits the offense of injury
to a child if he intentionally or knowingly by act causes serious bodily injury
to a child.  Id.  Serious bodily injury is an injury that creates a
substantial risk of death or that causes death, serious permanent disfigurement,
or protracted loss or impairment of the function of any body member or organ.  Id. § 1.07(46) (Vernon 2003).

Texas
case law is replete with holdings that when an adult defendant has had sole
access to a child at the time its injuries are sustained, the evidence is
sufficient to support a conviction for injury to a child, or murder if the
child dies.  See Bryant v. State, 909 S.W.2d 579, 583 (Tex. App.—Tyler
1995, no pet.) (where evidence showed child had been left alone with defendant
and injuries to child occurred approximately thirty minutes prior to child
being brought to emergency room, evidence was sufficient to support
conviction);  Elledge v. State, 890 S.W.2d 843, 846 (Tex. App.—Austin
1994, pet. ref’d) (undisputed medical testimony placing adult defendant alone
with child when fatal injuries were sustained supported conviction for injury
to a child);  Butts v. State, 835 S.W.2d 147, 151 (Tex. App.—Corpus
Christi 1992, pet. ref’d) (injuries sustained by child established by medical
testimony to have occurred at time adult defendant admitted to sole possession
of child).

 

Garcia v. State, 16 S.W.3d 401, 405 (Tex. App.—El Paso 2000,
pet. ref’d).

III.  Legal Sufficiency of the Evidence

          Durham’s first two issues attack the
legal sufficiency of the evidence, asserting that the State failed to prove
that Chelsea suffered serious bodily injury, or, if she had suffered serious
bodily injury, that Durham inflicted that injury.[1]

          A.  Standard of Review

When reviewing a challenge to the legal
sufficiency of the evidence to establish the elements of a penal offense, we
must determine whether, after viewing all the evidence in the light most
favorable to the verdict, any rational trier of fact could have found the
essential elements of the offense beyond a reasonable doubt.  See Jackson v. Virginia, 443 U.S. 307, 318-19, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560
(1979).  The standard is the same for both direct and circumstantial evidence
cases.  Kutzner v. State, 994 S.W.2d 180, 184 (Tex. Crim. App. 1999).

We do not resolve any conflict of fact or assign
credibility to the witnesses, as this was the function of the trier of fact.  See
Dewberry v. State, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999); Adelman v.
State, 828 S.W.2d 418, 421 (Tex. Crim. App. 1992); Matson v. State,
819 S.W.2d 839, 843 (Tex. Crim. App. 1991).  Instead, our duty is to determine
if the findings of the trier of fact are rational by viewing all of the
evidence admitted at trial in the light most favorable to the verdict.  Adelman,
828 S.W.2d at 422.  In so doing, any inconsistencies in the evidence are
resolved in favor of the verdict.  Curry v. State, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000); Matson, 819 S.W.2d at 843.

B.  The evidence

Because of the numerous witnesses who testified
at trial and the competing medical theories and voluminous medical testimony,
our discussion of the evidence at trial is lengthy and detailed.

          Angela Miller.  Angela, Chelsea’s mother, began living with Durham in Livingston in October 2002 when she was 17;
they were not married.  Angela’s pregnancy with Chelsea was planned, and Chelsea was born without complications on June 13, 2003.  Chelsea had no serious injuries
before her death; she had only a small bruise on her right temple a few days
before July 12 that Angela and Durham thought was caused by the plastic on Chelsea’s bouncer.  Chelsea occasionally scratched herself, so they put mittens or socks
on her hands, but the scratches were tiny.

In early July, Angela invited Tim Moseley, a
friend, to stay with them after he had trouble with his girlfriend, Kandyce
Puckett.  Sometime in the week before July 12, Angela, Durham, Moseley, and a
neighbor smoked marihuana and snorted methamphetamine (“meth”).  They used meth
three or more times that week, but she could not remember the last day they had
used it.

Before July 12, Chelsea was behaving normally—she
did not cry much and normally slept five to six hours at night.  Angela fed her
for the last time around midnight on the 11th; Chelsea took most of her bottle,
and Durham took her to the nursery to rock her to sleep.  That night Chelsea did not wake up—if Chelsea cried, it would awaken Angela, who could hear her
through a baby monitor.  When Chelsea woke up crying around 10:00 a.m., Durham volunteered—after Angela nudged him—to get up and feed her.  Angela stayed in bed
to go back to sleep; she heard Durham running water to make Chelsea’s formula
bottle and talking to Chelsea as he went into her room.  The next thing that Angela
recalled was Durham coming to her with Chelsea and telling her that there was
something wrong—that Chelsea wasn’t breathing; she was gasping for air.  Angela
telephoned their neighbor Amber for help.

          Angela immediately noticed that
Chelsea had fresh scratches on her nose that were unlike the scratches Chelsea had
made herself and that had not been there the night before.  Also, her face was
bruised; she had a bruise on her cheek and another bruise behind her ear, and
neither had been there the night before.  Angela asked Durham what had
happened, and he told her that Chelsea had choked on her formula and that he
had tried a few things to get her to breathe—the Heimlich maneuver, a bulb
syringe to clear out her throat, patting her on the back, and massaging her
throat.

          Amber arrived after a couple of minutes,
and they all raced Chelsea to the Livingston hospital, where Durham carried Chelsea into the emergency room.  Chelsea was then flown to Hermann Hospital in Houston.  After talking to doctors and the police, Angela and Durham drove to Houston with Moseley and Kandyce.  Durham appeared very upset to Angela that day, but she
questioned how upset he really was because he smoked marihuana on the drive to Houston.  Chelsea was taken off life support at Hermann on July 13, and she died.

          Amber Granger.  Amber, a
neighbor, came over after being called by Angela.  She saw that Chelsea’s lips were turning blue; she looked lifeless and was unresponsive.  Chelsea had bruises near her eye and jawline, scratches on her collarbone, and blood
around her nostrils.  Amber had last seen Chelsea a week before, and she had appeared
okay then.  

          Tim Moseley.  Moseley, 19, said
that on July 6, he and Durham bought a bag of meth, which they used that week. 
He used it once, and Durham used it three or more times through the week.

Moseley slept on the couch the night of July 11
and did not hear Chelsea wake up during the night.  At the hospital, Moseley
overheard Durham tell the doctors that Chelsea had choked on her milk.  As they
were all getting in the car to go to Houston, Durham remarked to Moseley that
“if it weren’t for some of the things Angela said, he [Durham] would have got
away with it.”  On the drive to Houston, Moseley and Durham were in the back
seat, and they smoked marihuana.

After waiting at Hermann for several hours, Moseley
and Kandyce returned to Livingston.  On the night of July 13, after Chelsea’s death, Durham and Moseley played video games and smoked marihuana.  Durham did not seem upset; he was just “his normal self.”  Durham told him that if he
signed papers to have Chelsea taken off life support, he would be charged with
murder.  Moseley further heard Durham say that Chelsea “didn’t deserve to be
here in this hell anyway.”  In Moseley’s opinion, Durham had admitted to him at
 Hermann Hospital that he had accidentally killed Chelsea, but at trial that he
no longer believed that Durham had not intentionally harmed Chelsea.

          Kandyce Puckett.  Kandyce,
Moseley’s girlfriend, saw Chelsea two or three days a week, and she never
noticed Chelsea having any injuries or ailments.  Before Saturday July 11, she
had last seen Chelsea on Wednesday, and she seemed normal.  Kandyce saw no
scratches or abrasions, but she had two bruises on the right side of her face.

          At Hermann, Kandyce overheard Durham say, “If Angela hadn’t said what she said, I might could have gotten away with
this.”  On cross-examination she agreed that Durham made this comment in the
car or at home, not at Hermann.  She also recalled telling police that Durham said, “I’m probably going to go to jail for this” and that he figured he would
probably get the blame.  Kandyce further overheard Durham say in Houston that “they’re going to get me for murdering my baby because I was the last one
with her.”

          When Kandyce returned to Livingston on the evening of July 12, she found a baby rag with blood on it in the nursery. 
She put it in a pile of clothes and later told the police about it.[2] 
She returned to Houston the next day and saw Chelsea; she noticed that Chelsea had marks on her nose and was swollen.  She had not seen the marks before that day
and did not know how they got there.

Kandyce thought that Durham did not seem
concerned about Chelsea’s welfare.  While Durham did cry some over Chelsea, Angela was a “disaster” compared to him.  He said that Chelsea “didn’t deserve to
be in this hell anyways, she was in a better place now.”  After they all
returned to Livingston the night of July 13, Durham did not seem to Kandyce to
be grieving; he was just playing video games.

Jonathan Durham.  Durham testified in his own defense.  After he
and Angela began living together, they decided to have a baby, and Angela
became pregnant.  Durham recalled that Chelsea got a bruise on her temple at
some point before July 12, and he believed it was caused by the swing.  Durham did not think that either Moseley or Angela did anything to Chelsea.  

Durham
could not recall what time he went to bed on the night of July 11.[3] 
On the morning of July 12, Angela nudged him to get up when Chelsea’s crying
woke her.  He got up to fix her bottle, and he remembered saying, “Daddy’s got
your bottle.”  As he was fixing the bottle, Chelsea was crying.  When he walked
in the nursery, Chelsea was lying in the crib.  He picked her up and wrapped
her in a blanket.  Sitting in a rocking chair, he put Chelsea between his knees
and started to feed her. 

While she was feeding, Chelsea had reflux and
the formula came out of her nose.  He took the bottle out of her mouth, and she
started choking on the formula.  She had never choked while he was alone with
her, and he had never seen it happen while she was feeding.  He did not know if
Angela was awake, and he did not think of calling her for help.  He rolled Chelsea on her side, held her head in his palm, and patted her on the back.  She was not
breathing normally, but was coughing.  She then stopped making any sound, and
her whole face got red.  He did not know how long Chelsea choked or how long he
was in the room with her.  He pushed her chest to try CPR, but first he tried
the Heimlich.  As he tried to revive her, she spit up.  She moved her arms a
little, and then she went limp.  He tried “mouth-to-mouth” to get her air, and
he used a bulb syringe to get the substance out of her nose.  Using his thumb
and finger, he then pinched her nose to draw out the substance.

After ten or fifteen minutes, Durham took Chelsea to Angela in their bedroom and told her there was something wrong.  Angela got up
and called Amber, who arrived in a few minutes, and they took Chelsea to the
hospital.  Although Chelsea’s grandmother and great-grandmother went into the
treatment room in the Livingston ER to see Chelsea, Durham did not; he said he
did not know he could go in to see her.  At the Livingston hospital, he talked
to Detective Bohnert, telling him what had happened with Chelsea.  On the drive
to Houston, he was scared, so he smoked marihuana because he needed help
dealing with the situation.

Durham
denied admitting guilt to anyone and denied intentionally hurting Chelsea.  Chelsea had rolled off a footstool in the nursery several days before July 11
after he left her on it and left the room.  When he returned and found her on
the floor, she did not appear to be hurt.  Durham denied ever trying to make
excuses to the police about the footstool or crib vibrator as causing Chelsea’s injuries, and he denied that Chelsea’s needs irritated him or interfered with
him.

When Durham and his attorney met with the
prosecutor and the police on July 24, he did not mention reflux or preexisting
bruises or scratches; he did not mention some things because his attorney would
not let him talk much.  In response to whether his story had evolved over time,
 Durham said that his attorney thought it was best for Durham to keep certain
details to himself.  And when asked whether he was more concerned with his fate
than giving an accurate history to the medical providers, Durham said, “I was
told to keep my mouth shut” and “I was just doing what they told to me.”  Durham said that he may not have been exact in talking to Det. Bohnert, and he did not
explain further to police because his father, a criminal defense attorney, had
told him not to talk.

Durham
could not explain why he did not call 9-1-1 or call out for Angela that
morning, particularly with the baby monitor right there.  He said that Chelsea did not bleed at all that morning; her abrasions and scratches had previously
occurred.  The scratches were there two or three days before July 12, but at
the July 24 meeting he said that Chelsea did not have any injuries.  The blood
on the blanket or towel came from Chelsea cutting her gum one day, and Durham said he used a blanket to blot it.  As for the blood on Chelsea’s clothing, he
suggested that hospital personnel had caused her abrasions to bleed.  When
questioned further about the scratches on Chelsea’s nose, Durham denied
testifying that she had scratched herself.  After his previous contradictory
testimony was read back, he said that Chelsea had not scratched herself but
that he had scratched her two or three days before; he later said that he did
it by pinching her nose to clear it.

Regarding his statements to Kandyce and Moseley
that he could have “gotten out of it” if Angela had kept her mouth shut, Durham admitted making the statement.  He explained:  “I remember saying it and I think she
[Angela] was talking to Detective Bohnert. . . .  and she said something and I
had figured that they were going to suspect me, so I can’t really remember what
she said that made it look like I was to blame.”  He further agreed that he
told Kandyce at Hermann that he would probably go to jail for murdering his
daughter.  As for his statement that Chelsea did not “deserve to be in this
hell,” Durham explained that he and Angela “went a little fast” and “should
have thought about having a child.”  Durham and Angela did not stay at Hermann
until Chelsea’s life support was disconnected, but instead returned to
Livingston because he did not want to see Chelsea take her last breaths.

          Willie Hawkins, M.D.  On July
12, Dr. Hawkins was on duty in the Livingston hospital emergency room.  Durham carried Chelsea into the ER; she was “code blue and lifeless.”  While reviving Chelsea, Dr. Hawkins observed obvious injuries, including facial bruises, head abrasions, and
bloody nostrils that he said were not caused by his and his staff’s treatment. 
They used suction to clear her airway because of some type of secretion, but it
wasn’t blocking her airway.  After reviving Chelsea, they arranged a transfer
to Houston.

          Durham told Dr. Hawkins that Chelsea had choked on her formula about twenty minutes before they arrived at the hospital
and that Chelsea’s bruises were caused by his turning her head from one side to
the other.  Dr. Hawkins’s notes in the hospital records stated that Durham said that Chelsea’s nose abrasions were from his cleaning her nose.  In comparing
Chelsea’s actual injuries to the history that Durham had given, Dr. Hawkins thought
that Durham’s history did not make sense; he suspected foul play and had police
contacted.  Dr. Hawkins was not surprised when he later learned of Chelsea’s brain trauma.  He had reviewed Chelsea’s autopsy report, and he said that he and
his staff did not cause Chelsea’s broken ribs and head injuries.  Dr. Hawkins explained
that infants sustain few rib fractures during CPR because their ribs are much
more pliable.

          Stacy Wilson.  Wilson, a
Livingston hospital nurse, was on duty in the ER as a charge nurse when Chelsea was brought in.  They began resuscitation efforts, suctioning four or five
teaspoons of milky substance from the back of her throat and intubating her. 
Wilson undressed Chelsea, noticed obvious bruising to her head, face, and one
hand, and noted the injuries, including a Battle sign (an injury behind the ear
seen often with head injuries), in Chelsea’s chart.  Because Chelsea’s injuries
did not correspond to the father’s history, Wilson instructed the ER staff to
call the police.

          Karrie Lewis.  Lewis, a
pediatric transport nurse, assisted with the helicopter transport from Livingston to Hermann.  Chelsea’s appearance was not consistent with that of a child who
had choked.  Lewis said that Chelsea’s injuries were not caused by the
helicopter transport, as they were very careful with Chelsea.  She also did not
think that CPR caused Chelsea’s rib fractures because children’s bones are
pliable.  She said that if rib fractures occur during CPR, they are usually
located near the sternum on the chest, not near the spinal column like Chelsea’s fractures.  Lewis testified that, in her experience, injuries like Chelsea’s were always caused by abuse or some form of trauma such as a car accident.

          Singaraju Katari, M.D.  Dr.
Katari, a pediatrician, was called to the Livingston ER on July 12 because he
had previously treated Chelsea.[4]  Chelsea appeared to be neurologically dead.  Dr. Katari talked to Angela and Durham about what had happened, and Durham said that he had been feeding the baby when she
choked and vomited.  When he examined Chelsea, he noticed abrasions near her
nose.  Dr. Katari could not make a specific diagnosis, but he did note SIDS as
a possibility because it is a common cause of death among children Chelsea’s age.  However, Durham’s story did not fit with what he saw, and Dr. Katari noted
that non-accidental injury needed to be excluded as a cause.

          Julie McInnis.  McInnis was a
pediatric intensive care nurse at Hermann, where Chelsea was placed on a
ventilator.  McInnis noted the bruises and abrasions on Chelsea’s face, neck,
and head, including bruises behind the ear, on top of the head, and on both
sides of the neck.  Although Livingston medical personnel had not reported neck
bruising, McInnis said that it sometimes takes a while for bruising to show.  Because
 Chelsea was obviously the victim of some type of trauma, McInnis called in
various specialists and social workers.  The next day, McInnis participated in
a care conference with Chelsea’s family.  When the doctor told Durham that Chelsea was not going to survive and that someone “did this” to Chelsea, Durham just bowed
his head and said nothing.  

          Giuseppe Colasurdo, M.D.  Dr.
Colasurdo, an attending pediatrician at Hermann, treated Chelsea on July 13.  By
the time that Chelsea was admitted to Hermann, she was clinically dead, though
on life support.  Their goal became looking for the cause of death because
there was little treatment to offer her.  His diagnosis was severe traumatic
brain injury with brain death likely due to abuse.

          The history provided to him was a
choking incident and apnea.  Asked to consider all of Durham’s explanations
(Heimlich attempt, CPR attempt, massaging the throat, falling from a footstool,
and a spring hitting the head), Dr. Colasurdo concluded that none would explain
 Chelsea’s injuries.  After treating her and reviewing the autopsy findings,
he had no doubt that Chelsea was intentionally injured.  There was no medical explanation other than
child abuse for the totality of Chelsea’s injuries.

          Stephen Fletcher, D.O.  To
explain Chelsea’s injuries, Dr. Fletcher, chief of pediatric neurosurgery at
Hermann, described the various layers of flesh and bone overlying the brain and
various types of brain injuries that can occur.  “Diffuse axonal injury” is
trauma where the gray matter and white matter planes in the brain are caused by
external forces to slide “out of kilter.”  The types of external
forces—acceleration or deceleration forces—that might cause diffuse axonal
injury in a child include car accidents, falls off a bike, riding a roller
coaster, being forcibly struck, and being banged against a wall or other object
forcefully.  The degree of injury depends in part on the magnitude of force
applied.  

 “Shaken impact syndrome” refers to a baby that
is shaken and also thrown or hit.  In shaken baby cases, injuries generally
include diffuse cerebral edema, sometimes external injuries, and injuries to
the cranial-cervical junction (where the head meets the spine).  Where more
external injury is seen, the case is more likely shaken impact syndrome.  Such
external signs of injury can include subscalpular hematomas, as well as surface
bruises and abrasions.  Neurosurgeons also look for bruising behind the ear,
swelling and bruising on the back of the head, and swelling on the scalp.

          Dr. Fletcher consulted on Chelsea’s case and observed her external signs of trauma, including multiple bruises and
the Battle sign behind her left ear.  He reviewed her CT scan results and
determined that she was brain dead as a result of traumatic brain injury,
specifically a blow to the back left portion of the head.  Dr. Fletcher also
reviewed the Harris County Medical Examiner’s autopsy report on Chelsea, and it
revealed subscalpular hemorrhage, subdural and subarachnoid hemorrhaging,
swollen brain, and hemorrhage in the ligaments or soft tissue at the base of
the skull on the left side.  She also had blood in the subdural space in the
thoracic spinal canal.  In Dr. Fletcher’s opinion, Chelsea suffered an impact
to the skull and had a skull fracture because she had widenings along the
occipital suture lines of the posterior skull plates.

          Morna Gonsulin, M.D.  Dr.
Gonsulin, an assistant Harris County medical examiner, performed Chelsea’s autopsy on July 14 and described her findings in great detail.[5] 
According to Dr. Gonsulin, the resuscitation efforts described by Durham would not explain Chelsea’s injuries, nor could a fall from a footstool or a blow
from a spring have caused such head trauma or all the other injuries.

          Richard Hirshberg, M.D.  Dr.
Hirshberg, a retired neurosurgeon, testified as an expert witness for the
defense.  In his opinion, Chelsea died from lack of oxygen after choking on
formula.  Durham had tried to perform a Heimlich maneuver, which squeezed Chelsea’s chest, and medical personnel performing CPR could have fractured ribs, which he
said commonly occurs in CPR.  Because of the choking, her brain swelled from
lack of oxygen.  He did not believe that Chelsea had suffered any external head
injury.  

Relying on the Hermann CT scan, Dr. Hirshberg
said that Chelsea had only mild or tiny subdural and subarachnoid hemorrhaging,
and the presence of DIC caused later additional hemorrhaging found in the
autopsy.  The subdural hematoma found on autopsy could not have been very large
because it did not displace or crush the brain.  If Chelsea had a head injury
that caused her to stop breathing, there should have been evidence of diffuse
axonal injury to the brain stem, which he believed was not found.  He said that
 Chelsea was treated for DIC and believed such treatment meant that she
suffered from DIC.  He concluded that whatever hemorrhages occurred inside or
outside her skull resulted from DIC or lack of oxygen and had no effect on her
brain stem function and did not contribute to her death.

Chelsea’s
fresh rib fractures were caused by CPR at the hospital and the older rib
fractures were at least four weeks old.  His opinion was that Chelsea had a
brittle bone disease; the rib fractures were not caused by a direct blow
because there was no bruising around the fracture locations.  Also, the four
separate subscalpular hemorrhages were caused by spontaneous bleeding during
the resuscitation attempts due in part to DIC.  Dr. Hirshberg did not believe
that Chelsea had either a shearing injury or diffuse axonal injury because he
said she had small subdural hematomas, her brain stem was not injured except
for lack of oxygen, and her brain stem had no hemorrhages or diffuse axonal
injury.  He contended that Chelsea had no head or brain trauma other than
oxygen deprivation and that it was reasonable that Durham caused the scratches
to Chelsea’s nose by trying to clear milk from her nose.

Harry Wilson, M.D.  Dr. Wilson, a pediatric pathologist board
certified in pediatrics, pediatric hema-oncology, anatomic pathology, clinical
pathology, and pediatric pathology, was called by the State in rebuttal.  Dr.
Wilson concluded that, to a reasonable degree of medical certainty, Chelsea died from homicide as a result of lethal blunt force trauma to her head, damaging
her brain and causing severe brain swelling.  He agreed with Dr. Gonsulin’s
conclusion that Chelsea sustained a lethal blow to the head that was evidenced
by the bruise behind her left ear, the large band of subscalpular hemorrhage
corresponding to that bruise, the subdural hematoma corresponding to those
injuries, and severe brain swelling.  He said that these factors were classic
symptoms of Tin Ear Syndrome, where an infant receives a severe blow to the
side of the head.  These factors are indicative of child abuse in the absence
of a reasonable explanation of injury such as falling out of a window or being
in a car crash.  Dr. Wilson testified that no natural events could have caused Chelsea’s bleeding distribution.

          Ken Bohnert.  Detective Bohnert
responded to the hospital at 11:25 a.m. on Saturday, July 12.  He viewed Chelsea and saw some scratches and bruising, then interviewed her family members,
including Angela and Durham.  Durham told Bohnert his version of the events.  Bohnert
took photographs of Chelsea at the hospital that showed scratches on the left
side of her face and under her eye and a bruised area behind her left ear. 
Bohnert thought that Durham’s explanation about Chelsea’s choking on her
formula was plausible, but it did not explain the bruising and scratching. 
After talking to the family and learning that they were going to Houston, Bohnert told them that he would need written statements from them later.

          Bohnert took a statement from Angela
and interviewed family friends, including Durham’s mother, and on July 24, Bohnert,
the prosecutor, and an investigator questioned both Durham and his attorney,
who both answered their questions and were told there were no other suspects.

C.  Analysis of the evidence in the light most
favorable to the verdict

          Durham testified that Chelsea was crying when he got up that morning to feed.  Angela corroborated that Chelsea was awake and crying when Durham got up to feed her.  Durham was alone with Chelsea for ten to fifteen minutes before bringing her to Angela, who had last bathed Chelsea the day before and saw no bruises on her.

The State’s physician witnesses testified that Chelsea was rendered unconscious almost immediately from a blow to the head.  Dr. Fletcher
testified that Chelsea had a traumatic brain injury from a blow to her head,
that in all probability she was rendered immediately unconscious, and that had
she sustained this injury earlier, she would not have awakened, cried, or tried
to feed.  Dr. Gonsulin discussed Chelsea’s internal head and neck injuries in
detail and testified that she died from subdural and subarachnoid hemorrhage as
a result of blunt force trauma.  Dr. Wilson said that Chelsea had probably
already started nursing from her bottle when she sustained the blow, and that
the blow or blows to her head made her choke.  

Considering all of the evidence in the light most
favorable to the verdict, the jury could rationally have found beyond a
reasonable doubt that Durham committed the offense of injury to a child.  Jackson, 443 U.S. at 318-319, 99 S.Ct. at 2788-89, Garcia, 16 S.W.3d at 405. 
Finding the evidence to be legally sufficient to support the conviction, we
overrule Durham’s first, second and sixteenth issues. 

IV.  Factual Sufficiency of the Evidence

          Issues three and four attack the
factual sufficiency of the evidence, asserting that the State failed to prove
that Chelsea suffered serious bodily injury, or if she had suffered serious
bodily injury, that Durham inflicted that injury.  Issue three complains of the
trial court’s denial of his motion for instructed verdict grounded on factual
insufficiency and is treated as an attack on the sufficiency of the evidence.  McDuff,
939 S.W.2d at 613.

          A.  Standard of Review

In a factual-sufficiency review, we view all of the evidence in
a neutral light and consider only whether a jury was rationally justified in
finding guilt beyond a reasonable doubt.  Zuniga v. State, 144 S.W.3d
477, 484 (Tex. Crim. App. 2004).  However, there are two ways in which the
evidence may be insufficient.  Id.  First, when considered by itself,
evidence supporting the verdict may be too weak to support the finding of guilt
beyond a reasonable doubt.  Id.  Second, there may be both evidence
supporting the verdict and evidence contrary to the verdict.  Id. 
Weighing all the evidence under this balancing scale, the contrary evidence may
be strong enough that the beyond-a-reasonable-doubt standard could not have
been met, so the guilty verdict should not stand.  Id. at 485.  This
standard acknowledges that evidence of guilt can preponderate in favor of
conviction but still be insufficient to prove the elements of the crime beyond
a reasonable doubt.  Id.  Stated another way, evidence supporting guilt
can outweigh the contrary proof and still be factually insufficient under a
beyond-a-reasonable-doubt standard.  Id.

Zuniga also reminds us that we must defer to the jury=s determination.  See id. at 481. (citing Cain v. State,
958 S.W.2d 404, 407 (Tex. Crim. App. 1997)).  The jury determines the
credibility of the witnesses and may “believe all, some, or none of the
testimony.”  Chambers v. State, 805 S.W.2d 459, 461 (Tex. Crim. App.
1991).  It is the jury that accepts or rejects reasonably equal competing
theories of a case.  Goodman v. State, 66 S.W.3d 283, 285 (Tex. Crim. App. 2001).  The evidence is not factually insufficient merely because
the factfinder resolved conflicting views of evidence in favor of the State.  Cain,
958 S.W.2d at 410.

B.  Additional evidence in a neutral light

          In preparation for Chelsea, Durham helped fix a room into a nursery for the baby.  After Chelsea’s June 13 birth, he
took about a week off of work to help Angela.  Durham helped with feeding and
diaper-changing when he was not at work.  Durham said that while still at the
hospital the day after her birth, Chelsea had an incident when she turned red
and choked, and a nurse picked her up and patted her back.  The nurse showed
them how to use a bulb syringe if Chelsea had reflux.

Before July 12, Angela had no reason to believe
that anyone had abused Chelsea.  Chelsea had no serious medical problems, but
several times she had “reflux,” which Angela described as spitting up milk and
sometimes almost choking on it, which only occurred about three times.

When Durham went in to feed Chelsea on July 12,
the baby monitor was on and Angela only heard Durham talking to Chelsea softly.  Angela said that the bruises on Chelsea’s check looked like fingerprints,
and she did not see the bruise behind Chelsea’s ear until she saw it first in a
photograph.  She admitted that she told the police a week later that she had
seen a bruise on Chelsea’s left cheek earlier and thought it might have been
caused by the swing.  Angela told the police that Durham was very upset as they
waited at the hospital for news about Chelsea and that she had never seen him cry
before that day.  He did cry at the hospital that day, was “very sad” and “very
upset” about Chelsea, and took off a whole week of work because he was so upset
over Chelsea.  Kandyce agreed that Durham had cried “a few tears” at the ICU
and that it was possible that Durham was grieving by playing video games.

Durham
told Amber that the bruise near Chelsea’s eye was from where he had rubbed her
head, that the bruises on Chelsea’s jawline and collarbone were from her
position in the swing, and that Chelsea had blood around her nose because they
had wiped her nose so much from her spitting up that her nose had become raw.  On
July 13, Durham told Moseley for the first time that he had been messing with a
spring on a box on the side of the baby bed when it shot off and hit Chelsea in the head.  Durham also told Moseley that he had placed Chelsea on a footstool
and that she had rolled off and hit her head.  Durham told Kandyce that Chelsea had a fractured skull and cheekbone and said that she had rolled off the stool and
that a spring had hit her in the head.

Durham
denied using meth the week before Chelsea died.  He said that he and Moseley
had bought and used the meth a week or two after Chelsea’s birth, disputing
Angela’s and Moseley’s testimony that they had used meth the week before
Chelsea’s death.  He said that the meth made him feel calm.  When he used meth,
he went for days without sleeping, staying up all night and “partying” or
playing video games.

Durham disputed
Angela’s memory that she last fed Chelsea at midnight and put her down to sleep
at 1:00 a.m. on July 12.  He did not know when Chelsea had last been fed that
night, and he did not know if anyone got up to feed her during the night.  Durham said that Chelsea was a good baby and generally slept all night, as much as eight
hours.  On the morning of July 12, he was not angry with Chelsea’s causing him
to have to wake up or with her crying.

C.  Analysis of the evidence in a neutral light

In his factual sufficiency points, Durham claims that his expert was as “equally persuasive” as the State’s experts.  When
the defense recalled Dr. Hirshberg, he reiterated that Chelsea had no head
trauma but suffered from DIC, which caused her to bleed excessively.  Dr.
Colasurdo, Dr. Fletcher, Dr. Gonsulin, and Dr. Wilson all disagreed with and
dismissed Dr. Hirshberg’s opinion that Chelsea’s choking on formula led to
anoxia, that DIC caused her bruising and brain hemorrhaging, and that CPR
caused her rib fractures.

Dr. Hirshberg had not gone to the Medical
Examiner’s office and reviewed the available microscopic slides and had not
interviewed Durham.  He had never performed an autopsy for the legal purpose of
determining the cause and manner of death.  He agreed that impact on an
immature brain is more likely to cause a shearing injury rather than typical
brain contusions that occur in older children because the impact’s force is
more effectively transferred through the thin pliant skull and across the
shallow subarachnoid space of a young child’s head and because the brain tissue
consistency is soft.  He also agreed that, in general, rotational movements of
the brain result in shearing injury or diffuse axonal injury.

The jury was free to reject Durham’s inconsistent
and controverted versions of what happened to Chelsea in the nursery and her
preexisting injuries and Dr. Hirshberg’s competing medical theory that Chelsea’s death was the result of oxygen deprivation resulting from choking on formula and
DIC.  Goodman, 66 S.W.3d at 285; Chambers, 805 S.W.2d
at 461.  Considering all of
the evidence in a neutral light, we cannot say that the jury was not rationally
justified in finding Durham guilty.  Zuniga, 144 S.W.3d at 484.  The evidence
supporting the finding of guilt, considered alone, was not too weak to support
the finding beyond a reasonable doubt, and the contrary evidence was not so
strong that the reasonable-doubt standard was not met.  See id. at 484-85.
 We must defer to the jury’s determination of the credibility of the witnesses,
and we may not ignore evidence that supports the jury’s verdict.  Johnson v.
State, 23 S.W.3d 1, 7 (Tex. Crim. App. 2000); Cain, 958 S.W.2d at
407.  The jury’s finding of guilt was rational; we find the evidence factually
sufficient, and we overrule Durham’s third and fourth issues.




V.  Jury Instruction Error

Issue seventeen asserts that the trial court
erred in instructing the jury that they were authorized to convict Durham if they found that the manner and means of causing injury to Chelsea was unknown to
the grand jury and the State offered no evidence to that effect.  He contends
that the jury instruction allowed the jury to speculate about the manner and
means of Chelsea’s injury beyond the evidence presented by the State and
reduced the State’s burden of beyond a reasonable doubt because the jury
allegedly was given its own option of deciding the manner and means of the
injuries.

Durham
admits that the State was not required to present evidence that the grand jury
used due diligence to determine the manner and means of injury.  See Rosales
v. State, 4 S.W.3d 228, 230-31 (Tex. Crim. App. 1999).  He also admits that
sufficiency of the evidence is measured against a hypothetical charge
containing the elements of the offense.  See Malik v. State, 953 S.W.2d
234, 236-40 (Tex. Crim. App. 1997).  Durham has not cited authority in support
of this issue, and in any event, both Dr. Gonsulin and Dr. Wilson testified
that the injury could have been inflicted by a hand or other object by striking
 Chelsea’s head or causing her head to strike another object.  Issue seventeen
is overruled.

VI.  Autopsy Photographs

Issues ten through fifteen assert that the trial
court abused its discretion in admitting ten autopsy photographs because their
probative value was substantially outweighed by their prejudicial effect.[6] 
The trial court has discretion to admit photographs, and its decision will not
be disturbed on appeal unless it falls outside the “zone of reasonable disagreement”;
i.e., the trial court abused its discretion.  Jones v. State,
944 S.W.2d 642, 651 (Tex. Crim. App. 1996);
 Montgomery v. State, 810 S.W.2d 372, 391 (Tex. Crim. App.
1990).  Durham does not contend that the autopsy photographs were irrelevant. 
Thus, “[w]hen determining whether the trial court erred in admitting the
relevant photographs into evidence, our review is limited to determining
whether the probative value of the photos is substantially outweighed by the
danger of unfair prejudice, confusion of the issues, or misleading the jury, or
by considerations of undue delay, or needless presentation of cumulative
evidence.”  Wyatt v. State, 23 S.W.3d 18, 29 (Tex. Crim. App. 2000).

Evidence is unfairly prejudicial when it has “an
undue tendency to suggest that a decision be made on an improper basis.”  Montgomery, 810 S.W.2d at 389.  A Rule 403 analysis by the trial court should
include, but is not limited to, the following factors:  (1) how probative is
the evidence; (2) the potential of the evidence to impress the jury in some
irrational, but nevertheless indelible way; (3) the time the proponent needs to
develop the evidence; and (4) the proponent’s need for the evidence.  Reese
v. State, 33 S.W.3d 238, 240-41 (Tex. Crim. App. 2000).

Like other demonstrative evidence, photographs
should assist the factfinder with its guilt or punishment decision; a photograph
should add something that is “relevant, legitimate, and logical to the
testimony that accompanies it” and that assists the factfinder in its
decision-making duties.  Erazo v. State, 144 S.W.3d 487, 491 (Tex. Crim. App. 2004).  If a photograph is genuinely helpful, the photograph is
inadmissible only if its emotional and prejudicial aspects substantially
outweigh the helpful aspects.  Id. at 491-92.  In general, photographs
are admissible if verbal testimony about the matter shown in the photographs
would be admissible and the probative value is not outweighed by Rule 403
counter-factors.  Threadgill v. State, 146 S.W.3d 654, 670-71 (Tex. Crim.
App. 2004); see Tex. R. Evid.
403.

A trial court may consider numerous factors when
determining whether the probative value of relevant photographs is
substantiality outweighed by the danger of unfair prejudice.  See Hayes v.
State, 85 S.W.3d 809, 815 (Tex. Crim. App. 2002).  The court should
consider the number of photographs offered, their detail, their gruesomeness,
their size, whether they are close-up, whether they are in black and white or
color, and whether the body is clothed or naked.  See Wyatt, 23 S.W.3d at
29 (citing Long v. State, 823 S.W.2d 259, 271 (Tex. Crim. App. 1991)). 
While autopsy photographs are usually admitted, they should be excluded if they
show mutilation to the victim caused by the autopsy.  Rojas v. State,
986 S.W.2d 241, 249 (Tex. Crim. App. 1998).  However, if the disturbing nature
of the photographs is due primarily to the injuries caused by the defendant,
the changes to the victim’s body caused by the autopsy are of minor
significance.  See Hayes, 85 S.W.3d at 816 (citing Santellan v.
State, 939 S.W.2d 155, 173 (Tex. Crim. App. 1997)) (holding that photograph
depicting victim’s skin pulled back to show extent of the gunshot wound to her
face was admissible; pulling back victim’s skin did not make evidence more
gruesome); Salazar v. State, 38 S.W.3d 141, 151-52 (Tex. Crim. App. 2001)
(holding that autopsy photographs showing internal organs removed from victim’s
body were probative because they showed that internal injuries to victim did
not support appellant’s version of incident).

Given the State’s and defense’s competing
medical theories and the extensive pathology testimony by Dr. Gonsulin and Dr.
Wilson, the photographs were highly probative on the issue of the extent of
Chelsea’s brain injuries and cause of death.  They were disturbing, but they
were clinical and did not show unnecessary portions of Chelsea’s body; her
cut-away scalp masked a view of her face.  Only one photograph of each injury aspect
was admitted, and the time spent by Dr. Gonsulin to offer and describe the
photographs (20 pages of testimony out of more than 1,500 pages of
guilt-innocence testimony) was not unreasonable.

We hold that the trial court did not abuse its
discretion in admitting these ten autopsy photographs.  We overrule issues ten
through fifteen.

VII.  Extraneous Offense Evidence

Issues seven and eight complain of the relevance
of extraneous offense evidence of Durham’s drug use and its prejudicial effect:
use of meth in the week before the offense, and use of marihuana on the drive
to Houston.  His ninth issue complains of expert testimony on the effects of
meth withdrawal on the body.

A trial court has broad discretion in
determining the admissibility of evidence.  Coffin v. State, 885 S.W.2d
140, 149 (Tex. Crim. App. 1994).  We will not reverse the trial court’s ruling
absent an abuse of discretion.  Williams v. State, 535 S.W.2d 637, 639-40
(Tex. Crim. App. 1976).

Under Texas Rule of Evidence 404(b), evidence of
other crimes, wrongs, or acts is not admissible to prove the character of a
person to show action in conformity therewith.  Tex. R. Evid. 404(b).  But the “other crime, wrong, or act”
may have relevance “apart from character conformity; that it tends to establish
some elemental fact, such as identity or intent; that it tends to establish
some evidentiary fact, such as motive, opportunity or preparation, leading
inferentially to an elemental fact; or that it rebuts a defensive theory by
showing, e.g., absence of mistake or accident.”  Montgomery v.
State, 810 S.W.2d 372, 388-89 (Tex. Crim. App. 1990).  Additionally, same
transaction contextual evidence is admissible when it is necessary to the
jury’s understanding of the offense.  Rogers v. State, 853 S.W.2d
29, 33 (Tex. Crim. App. 1993).  As a general rule, the jury is entitled to know
all relevant surrounding facts and circumstances of the charged offense.  Moreno v. State, 721 S.W.2d 295, 301 (Tex. Crim. App. 1996).  Same
transaction contextual evidence is considered “res gestae,” under the
reasoning that events do not occur in a vacuum, and the jury has a right to
hear what occurred immediately before and after the commission of the act so
that it may realistically evaluate the evidence.  Wesbrook v. State, 29
S.W.3d 103, 115 (Tex. Crim. App. 2000).  The purpose of admitting same
transaction contextual evidence is to put the instant offense in context.  Camacho
v. State, 864 S.W.2d 524, 532 (Tex. Crim. App. 1993).

Angela testified that she and Durham used meth on
three or more occasions the week before Chelsea’s death.  Moseley testified
that he and Durham obtained the meth on Sunday, July 6, and that on Thursday,
July 10, Angela and Durham used meth.  Dr. Ashoaf Mozayani, the lab director
and toxicology chief for the Harris County Medical Examiner, described the
phases of the effects of binge use of meth and withdrawal from meth, which
first causes a high and then, as the drug wears off, causes the person to
become very sleepy, exhausted, and unsteady.  In the latest stage, called
“tweaking,” the person cannot sleep but cannot keep his eyes open, is
uncoordinated, can’t follow instructions, and loses balance.  Tweaking can last
up to 36 hours or even longer, depending on the amount of meth taken, its
purity, and the user’s tolerance.  If a person used meth repeatedly from July 6
to July 10, that person could still be in withdrawal stages from the drug on
the morning of July 12.  An analysis of a sample of Durham’s hair follicles did
not disclose the presence of meth.

The testimony about meth use and evidence of its
withdrawal effect placed the offense in context.  The evidence of meth
withdrawal was relevant to the jury’s understanding of how parents might sleep
through the night without hearing Chelsea cry, how Durham might have been
unusually irritable and sleep-deprived that morning, and how Chelsea might have
been extra fussy or inconsolable, triggering the possible frustration that
caused Durham to inflict her fatal and non-fatal injuries that morning.  Because
the testimony was admissible as same transaction contextual evidence, the trial
court did not abuse its discretion in admitting it.

The trial court also did not abuse its
discretion under Rule 403 in finding that the meth testimony’s probative value
outweighed its unfairly prejudicial effect.  The evidence was probative and
necessary to explain the context of the offense and Durham’s motive and intent
that morning.  The time required to develop the evidence was comparably minimal,
and it was not likely to impress the jury unfairly.

The trial court did not abuse its discretion in
admitting testimony that Durham smoked marihuana on the drive to Houston.  Its probative value outweighed its unfairly prejudicial effect, as it suggested Durham’s lack of remorse or concern about Chelsea.  It also was appropriately offered as
rebuttal in Angela’s redirect examination after she had testified on cross-examination
that Durham was very sad and upset about Chelsea and took off a whole week of
work after her death.  We overrule Durham’s issues seven, eight, and nine.

Durham
complains in issue nineteen of punishment-phase testimony by Durham’s
grandmother that a probation officer found Durham—who was staying with her at
the time—in possession of a firearm.  At trial he objected on grounds that the
probative value of this testimony was substantially outweighed by its unfairly prejudicial
effect.

In the punishment phase of a non-capital felony
trial, the admission of evidence is a question of policy, not of logical
relevance.  Mendiola v. State, 21 S.W.3d 282, 285 (Tex. Crim. App. 
2000).  “Determining what is relevant . . . should be a question of what is
helpful to the jury in determining the appropriate sentence in a particular
case.”  Rogers v. State, 991 S.W.2d 263, 265 (Tex. Crim. App.
1999).  We cannot say that the trial court abused its discretion. Issue nineteen
is overruled.

VIII.  Jury Argument

Issues five and eighteen contend that the trial
court erred in overruling Durham’s objections that the prosecutor was striking
at him over the shoulders of counsel.  Issue five complains that the State
improperly used Durham’s silence at the July 24 meeting—which he said was the
result of his attorney’s instructions to not talk—to attack his credibility,
which was an attack over the shoulders of counsel.

Improperly striking over the defense attorney’s
shoulders occurs when the prosecutor’s argument refers to defense counsel
personally and when the argument explicitly impugns defense counsel’s character. 
Guy v. State, 160 S.W.3d 606, 617 (Tex. App.—Fort Worth 2005, pet.
ref’d).  “Generally, a remark that strikes at the defendant
through his counsel is impermissible because such attacks only inflame the minds
of the jury to the defendant’s detriment.”  Id. at 616.  We find that
the testimony at issue was not a strike at Durham over his counsel’s shoulders;
it was a direct comment on Durham’s conduct and testimony.

With his testimony that he was told by his father (a criminal
defense attorney) and his trial attorney not to talk, Durham opened the door to
questions and testimony about why he did not tell the full story about Chelsea
to medical providers, social workers, and police.  The State did not
impermissibly or unfairly ask questions that elicited testimony having the
tendency to show that Durham was more concerned with protecting himself when he
did not give medical personnel and police a complete and accurate history of Chelsea.  We overrule issue five.

In issue eighteen, Durham asserts that the prosecutor struck at
him over the shoulders of counsel during closing argument by stating:  

He
[Durham’s attorney] is doing the very best he can to make sure that his client
gets a fair trial and his rights are represented, just as he was back in July
of last year when we all sat down together. . . .  I’m not going to suggest for
a minute that Mr. Linderman [one of Durham’s attorneys], on behalf of his
client, misrepresented anything. . . .  There was nothing ambiguous whatsoever
about the question that was asked at the time:  Did this child have any prior
injuries?  The answer was no.  And Mr. Linderman cannot help it if his client
had not been forthright with him beforehand.

 

          Mr. Linderman:  Objection, Your Honor. 
This invites—evades [invades] the province to suggest the attorney-client
communication privilege, and I object.

 

          THE
COURT:  All right.  Move along, Mr. Hon [the prosecutor].

 

          Mr. Linderman:  I’d ask the jury to
disregard.

 

          THE
COURT:  Overruled.

 

          Durham did not object at trial that the prosecutor was
striking at him over his counsel’s shoulders.  His complaint on appeal thus does not comport with
the objection that he made in the trial court, which is necessary for
preservation of the complaint.  See Broxton v. State, 909 S.W.2d 912, 918 (Tex. Crim. App. 1995)
(point of error must correspond to objection made at trial, and objection
stating one legal theory may not be used to support a different legal theory on
appeal).  For this reason, his
complaint has not been preserved for our review.  See Rezac v. State, 782 S.W.2d 869, 870 (Tex. Crim. App. 1990). 
Issue eighteen is overruled.

          In his sixth issue, Durham contends
that the trial court erred in denying his motion for mistrial because in
opening statement the prosecutor stated that Chelsea “in every sense of the
word became a murder victim.”  The trial court sustained Durham’s objection and
instructed the jury to disregard the comment, but denied his mistrial request.

We review a trial court’s denial of a motion for
mistrial for abuse of discretion.  Ladd v. State, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999).  In most instances, an instruction to disregard will cure the
error.  Wesbrook v. State, 29 S.W.3d 103, 115-16 (Tex. Crim. App. 2000).    
The prosecutor’s comment was quickly followed by an instruction to disregard
from the trial court, which we presume was complied with by the jury.  See
Colburn v. State, 966 S.W.2d 511, 520 (Tex. Crim. App. 1998).  Only offensive
or flagrant error warrants reversal when there has been an instruction to
disregard, and in the case at bar, this comment was not so flagrant that the
instruction to disregard was ineffective.  See Wilkerson v. State, 881
S.W.2d 321, 327 (Tex. Crim. App. 1994).  We cannot say that the trial court
abused its discretion in denying the mistrial motion, and we overrule Durham’s sixth issue.

In closing argument in punishment, the
prosecutor stated:  “Your verdict last week was on the front page of the Polk County
Enterprise on Sunday.”  Durham objected that the statement was “outside the
record.”  The trial court sustained the objection and instructed the jury to
disregard, but denied a request for a mistrial.  In issue twenty, Durham asserts that the prosecutor’s argument was not a plea for law enforcement.  His complaint on appeal thus does not comport with
the objection that he made in the trial court, which is necessary for
preservation of the complaint.  See Broxton,
909 S.W.2d at 918; Rezac, 782 S.W.2d at 870. In any event, the comment was not so flagrant that the
instruction to disregard was ineffective.  See Wilkerson, 881 S.W.2d at
327.  We cannot say that the trial court abused its discretion in denying the
mistrial motion.  Issue twenty is
overruled.

IX.  Admission of Evidence

          In issue twenty-two, Durham asserts
that the trial court erred in allowing Bohnert to testify as to “post arrest”
statements by his attorney and Durham’s “post arrest” silence, in violation of
the attorney-client privilege.  This issue relates to Bohnert’s testimony about
the July 24 meeting that Durham and his attorney voluntarily attended with the
prosecutor and police.  He testified about Durham’s answers and silence and his
attorney’s answers to questions in that meeting.  At that time, no charges had
been filed against Durham, Durham had not been arrested, he was not in custody,
and he was not arrested until August 26.  The trial court did not abuse its
discretion in allowing Bohnert’s testimony about the July 24 meeting.  We
overrule issue twenty-two.

X. 
Trial Court’s Conduct

Durham’s twenty-first
issue complains that the trial judge improperly entered the jury room and spoke
with jurors after they reached their guilt-innocence verdict.  Durham seeks an abatement of this appeal for a hearing on his motion for new trial that
asserts this complaint.

Article
36.22 provides that no person is permitted to be with a jury while it is
deliberating, and no person is permitted to converse with the jury about the case
on trial except in the presence and by the permission of the court.  Tex. Code Crim. Proc. Ann. art. 36.22 (Vernon 1981).  Durham belatedly filed a juror’s affidavit in support of his motion for new
trial.  That affidavit states:

On April 23, 2004 the
jury heard closing arguments from the State and the defense.  We began our
deliberations that day.  During the afternoon a note was sent out by the jury
inquiring about a definition that we wanted the court to provide us.  Later, a
note was returned signed by Judge Coker directing us to read the court’s
charge.  At some point later the Judge was in the jury room and told us that
she could not answer our question and that she could after the trial.  The jury
continued to deliberate and we came to our verdict later that same evening.

 

The record reflects that the trial judge
confirmed that she instructed the jury in the jury room to remember all the
court’s instructions and admonishments that evening.  It is unclear if the
juror’s affidavit and the trial court’s statement refer to the same event.

Article 36.22 prohibits any person from being
with the jury while it is deliberating.  Given the juror’s affidavit and
the trial court’s statement, it does not appear that the jury was deliberating
when the trial judge apparently entered the jury room.  While we do not
condone—and in fact intend to dissuade—any trial judge from communicating with
the jury when counsel is not present and without a record of the communication
being made, the communication at issue does not rise to an apparent violation
of article 36.22 or warrant an abatement for a hearing on the issue.  We
overrule issue twenty-one.




XI.  Conclusion

          Having overruled all of Durham’s issues, we affirm the trial court’s judgment.

 

 

BILL VANCE

Justice

 

Before
Chief Justice Gray,

Justice Vance, and

Justice Reyna

Affirmed

Opinion
delivered and filed October 26, 2005

Do
not publish

[CRPM]









    [1]       Issue
one complains of the trial court’s denial of his motion for instructed verdict
grounded on legal insufficiency.  This issue attacks the sufficiency of the
evidence and is treated as such.  McDuff v. State, 939 S.W.2d 607, 613
(Tex. Crim. App. 1997).





    [2]       Christy
Smejka, a DNA analyst with the DPS, tested bloody blankets from the trailer and
blood on Chelsea’s clothing, and the blood stains were Chelsea’s blood beyond a
statistical doubt.

 





    [3]       He
later said that he went to bed around 10:00 p.m.  During that night, Durham did not wake up, and he did not get up in the morning until Angela woke him when Chelsea was crying.  

 





    [4]       Dr.
Katari had seen Chelsea on two prior occasions, and other than jaundice, she
appeared to be a normal healthy baby.  On those occasions, he did not note any
bruising or abrasions.





    [5]       In issue sixteen, Durham
further asserts that the evidence is legally insufficient because there is no
evidence that the person Dr. Gonsulin autopsied was Chelsea and that her
testimony’s probative value should thus be discounted.  The autopsy report
admitted in evidence identifies the person as Chelsea.  It notes her date of
death as July 13, 2003, at the children’s hospital at Hermann Hospital in Houston after being received there from Livingston Memorial Hospital on July 12,
and that she was thirty days old at death.  Multiple photographs showing Chelsea before her injuries and before her death were identified by Angela and others. 
Also admitted were external autopsy photographs marked with a discrete autopsy
number and showing Chelsea’s face.  These photographs and the written autopsy
identification materials were sufficient to identify Chelsea as the person
autopsied by Dr. Gonsulin.  See Green v. State, 140 S.W.3d 776, 777 (Tex. App.—Eastland 2004, no pet.) (identification of photos in pen packets was sufficient
evidence to prove defendant’s identity as the person convicted).  Also, the
jury could compare the pre- and post-mortem photographs, determine they were of
the same child, and rely on Dr. Gonsulin’s autopsy and testimony.

 





    [6]       The ten autopsy photographs at
issue are of Chelsea’s internal head and neck injuries.  Four photographs
(Exhibits 27, 28, 30, and 37) depicted four separate impact sites on Chelsea’s head under the skin.  Two (Exhibits 69 and 70) depicted the sutures (joints) of
the skull from two different angles and were used by Dr. Gonsulin to explain
the skull fracture issue.  Two others (Exhibits 33 and 73) showed different
angles of the dura beneath the skull, showing the subdural and subarachnoid
hemorrhages, and another (Exhibit 34) showed the dura beneath the brain and was
used to refute the defense’s theory of a coagulation disorder.  And the last at
issue (Exhibit 25) depicted the hemorrhage in the back left side of the neck
and was used to support the finding and testimony about trauma to the neck from
a blow to the left side of the head.